Milligan, J.,
delivered the opinion of the Court.
This is an action brought in the Law Court of Memphis, by the Union Bank of Tennessee, against the maker and indorsers of the following note:
“$3,879. Memphis, Term., March 30, 1862.
“Eight months after date, I promise to pay to the order of W. E. Avant, thirty-eight hundred and seventy dollars, at the Branch of the Union Bank of Tennessee, at Memphis. Yalue received. W. A. Blown.
“By Ms Attorney, W. F. Avant.”
The note is indorsed, “W. F. Avant, Oxford,. Miss.;” “E. M. Apperson & Co.;” and discounted for E. M. Apperson & Co., on the 3d of March, 1862.
The declaration sets out the note according to its terms; and, after alleging the indorsements, avers due demand and notice of non-payment. The defendants plead nil debet; and, specially, that the indorsers, E. M. Apperson & Co., had no legal notice of the protest of the note; and that the consideration was Confederate Treasury Notes.
The jury, under the instructions of the Court, found for the bank: and an appeal in error is prosecuted to this Court.
The proof, as contained in the bill of exceptions, shows that the note was not protested until the 17th of July, 1865. The corporation, known as the Union Bank, consists of a parent bank, and several branches. The mother bank is located in the city of Nashville, and the branch, at which the note in controversy was discounted, in the city of Memphis. The note was drawn and discounted during the progress of the late civil war, and while the rebel military authorities occupied the city *448 of Memphis. Prior to the maturity of the note, the city was threatened by the United States military forces; and, on the 11th of March, 1862, General Slaughter, commanding the rebel troops stationed at that place, addressed the President and Directors of the Branch of the Union Bank at Memphis, the following note :
“Q-entlemen: — Circumstances, to which it is not now necessary to refer, render it imperative that I should be advised, whether you have received instructions from the parent bank, as to the policy which you are to observe, in case Memphis should be threatened or occupied by the enemy; and if so, what these instructions are, especially as to the removal of the assets of the bank; and to what point, and under what control, they are to be placed; and whether you intend to obey such instructions ? And, also, whether any of the assets of the bank have been removed; and if so, to what point, and under whose control they now are?
“ I am, respectfully, your obedient servant,
“JAS. E. SLAUGHTER,

“Col O. S. A.”

The reply to this note was directed to be made to L. D. McKissick, Civil Governor, and Provost Marshal, at the city of Memphis; and, on the 13th of March, 1862, two days after the date of Col. Slaughter’s note, E. W. Smith, the Cashier of the Branch of the Union ■ Bank at Memphis, returned the following reply:
“Sir: — In answer to. the communication of Col. Jas. E. Slaughter, Col. C. S. A., etc., of the 11th inst., addressed to this bank, I submit the following:
“No instructions have been received from the parent *449 bank, as to the policy to be observed by this branch, in case Memphis should be threatened or occupied by the enemy. The assets of this branch are now under its control ; and any order from the parent bank, the execution of which would place them beyond our control, or within the enemy’s lines, would not be obeyed.
“ Our coin, and $100,000 in Confederate Treasury notes, were removed to New Orleans, two or three weeks ago, and so disposed of as to be under the control of this branch. On the 11th of February, (upon the occupation of the State by the enemy,) the circulation of Union Bank notes on hand, were sent out to the parent bank, to be cancelled and destroyed. The assets now on hands, consist, mostly, of Confederate Notes, and are held to pay our depositors. Yours, respectfully,
“E. W. Smith, OasHer.”
“No other steps seem to have been taken with reference to the removal of the assets of the bank, until the 26th of April following, when Mr. McKissick again addressed the officers of the bank, informing them that transportation would be furnished by the military authorities, for the removal of the assets South; and that, in obedience to an order from Head-Quarters of the Army of the Mississippi, they were hereby ordered to remove all the assets, papers, coin and valuables, of every description, in the branch of said bank in the city of Memphis, to such a point within the Confederate lines, as may be best for their preservation, and most acceptable to the Confederate authorities, and your loyal customers residing there, when ascertained, beyond contingency or doubt, *450 that this city would fall into the hands of the Fed-eráis. Respectfully, yours,
“L. D. McKissick,

“Civ. Grov. and Pro. Mars’l.”

This note was followed by another from the Provost Marshal, bearing date the 29th of the same month, in which the cashier of the bank was informed, among other things, that it was the wish of the military authorities, that the present cashier and officers of the bank, continue the control and management of the assets, as heretofore, and that timely notice would bo given them when to act, etc.
Immediately following this' note, on the 1st of May, 1862, Mr. McKissick addressed the cashier another note, in explanation of this last note, in which he says: “The authorities of the Confederate States assume the right to control the assets of the bank, so far as, peremptorily, to order their removal, as indicated in my order of the 26th of April, 1862; but they do not desire to take possession of the assets; on the contrary, they request that the officers of the bank will accompany them, and remain in charge of them.”
To these last three notes, the cashier replied, under date of May 1, 1862; and, in his reply, he, in substance, informed the Provost Marshal, that the contemplated removal of the assets and property of the bank from Memphis, could not be carried out; but if done, it must be done by the military power of the Confederate States. But if the military powers should compel the removal of the assets, he desired to be permitted to accompany them, *451 and aid in providing for their deposit in some suitable place of safety, etc.
At the close of this correspondence, the final order for the removal of the assets, was issued, which is in the following language:
“ Office of' Crv. Gov. and Peo. MaR.
“Memphis, May 2T, 1862.

“To the Cashier, Officers and

“Directors of the Union Banlc at Memphis.

“Gfentlemen: — By command of General Beauregard, you are hereby ordered to place the hooks, papers, and assets of your hank, in a condition to he removed from the city forthwith. They will be removed on a special train to-morrow evening. Yours,
“L. D. MoKissiok,

“Civ. Gov. and Prov. Mars’V’

The hooks of the hank, together with all its assets, including the note in. controversy, and other valuable papers, were boxed up, and placed in charge of Mr. J. E. Sellers, one of the clerks of the hank, and T. J. Mun-ford, and W. S. Smith, with instructions, in writing, to secure their deposit in some place of safety, and to remain in charge of them, and prevent, as far- as possible, all interference with them. They were not to be opened, or otherwise interfered with, until they were again restored to the custody of the bank, etc.
The military order of the 27th of May, was not carried into execution until the next day, when the assets, hooks, and valuable papers of the hank, were all removed into the State of Georgia, where they remained until the close of the war,, in 1865.
*452 On the 6th of June, 1862, the city of Memphis was occupied by the United States troops, and held until the close of the war. The bank was opened in August following, and remained open during the business hours of each day, for the purpose of protecting the building, receiving special deposits, at the depositors’ risk, payments, etc., which might be voluntarily made, and for receipting for the same. It doe's not appear that the bank, during this period, did any regular business, although its officers and directors remained in the city, and drew their salaries, until February, 1864, when the mother bank furnished her branch at Memphis, with additional assets, and then the branch resumed active business.
Prior to the removal of the assets, on the 5th of May, 1862, and when the bank officers were apprised that they would be removed, the cashier states, that he caused a descriptive list of the notes, or bills receivable, then held by the bank, to be made out, which he retained in his possession, and for his protection, after the assets were removed. This list contained an accurate description of all the notes or bills in the bank, including the note sued ■on in this case, as to the makers and indorsers, the dates when executed, the time of maturity, and the amount secured by each. The places of payment of the notes or bills described in this list, appear to have been omitted. The reason of this omission, as stated by the cashier, was an oversight. There were several banks in Memphis, as he states, and it was not material in which they were payable-; and that he did not know when the note in suit was payable, and he had no means of knowing.

*453
The reason of removing the notes, as the cashier states, which was assigned to him, was, as Memphis was expected to he captured hy the Federal forces, to remove all means of talcing legal proceedings against the parties thereto.

It also appears, that, between the 5th of May, 1862, the time of taking the descriptive list of the notes held hy the hank, and their removal South, on the 28th of May following, the cashier had full access to, and control over, the assets of the bank, and could, had he desired to do so, have taken complete copies of all the notes or hills held by the hank, including the places of payment, etc.; hut he did not deem it necessary to do so,, and, therefore, it was omitted.
E. M. Apperson & Oo., as it appears, did most of their business with the branch of the Union Bank at Memphis, and the cashier thinks, that they made their own notes, and those they took from customers, payable at that hank. Three-fourths, and, possibly, all of the notes, carried South, as the cashier states, were payable at the Union Bank at Memphis.
The record also discloses the fact, that the cashier, under the directions of the mother bank at Nashville, went South, with the view of investing the Confederate money belonging to the bank, in cotton; and that he was arrested, in Georgia, by the Confederate military authorities, and sent, on his parol, to Richmond, where he was compelled, by Mr. Memminger, the Secretary of the Confederate States Treasury, in order to secure his release from arrest, to sign and forward to those in custody of the assets of the bank, the following note, viz:
*454 “ Richmond, Sept. 24, 1862.
“Messrs. J. F. Sellers, W. S. Smith, and T. J. Munford, Jr.
“ Cfentlemen: — The assets of the Branch of the Union Bank at Memphis, which are in your possession, at Athens, Ga., you will please place on deposit in one of the Georgia banks, to remain the property of the Union Bank; but not to be removed, except with the consent of the Confederate Government. R. W. Smith, Cashier
From this note, and the circumstances attending its execution, as well as the direct statement of the cashier, it appears he had, at no time after the removal of the assets South, control over them, or power to return them to Memphis. As soon, however, (as the record shows,) as it was convenient to bnng them back after the close of the war, they were returned; and, on the same day they reached the city of Memphis, or the next day thereafter, the note in controversy, with others held by the bank, were placed in the hands of a notary, and immediately protested. The proof is, that the assets were returned about the middle of July, 1865, and the protest, as before stated, bears date the 17th of the same month, 1865.
But prior to this time, on the 18th of May, 1865, a regular protest of the note now in suit, accompanied by demand and notice, was made out from a copy, drawn, as it seems, from the “descriptive list” retained by the cashier, which, although not taken from a literal copy, turns out, on comparison, to be an exact transcript of the original note.
The data from which the copy was taken, and the pro *455 test made, as shown by the cashier himself, was in the possession of the cashier at the maturity of the note; and at no time after the occupation of the city of Memphis by the United States troops, either before or after the maturity of the note, was there any risk, danger or difficulty in making demand of payment on a copy of the note, or in giving notice of its non-payment to E. M. Apperson & Co., or in leaving notice at their business house in the city. Ordinary business in the city, he states, a short time after the occupation by the Union army, was resumed, and no danger or difficulty attended its transaction, by persons residing within the United States military lines.
In 1868, E. M. Apperson & Co., paid to the Cashier of the branch of the Union Bank, at Memphis, a bill of exchange, drawn on New Orleans, upon which they were liable, the original of which was, at the time of payment, South, with the other assets of the bank. The cashier receipted for the payment, and, also, received, at different times, other payments on notes, contained in the “descriptive list,” during the absence of the originals. Others were renewed from the same list; but no effort was made, either before or after the bank resumed its regular business, in February, 1864, to protest the note in suit, on a copy, until the 13th of May, 1865, as before shown.
We have, as it is apparent, been more particular in this setting out the facts of this case, and, especially, those relied on as excusing demand and notice of protest, than we otherwise would have deemed it material, were it not that it has been supposed, the late civil war has in *456 volved the holders of commercial paper in doubts and difficulties, not heretofore met with in this State.
The errors assigned, are principally on the charge of the Court; and, without noticing each one in detail, it will be sufficient to declare the general principles which must control this case, and which are involved in the instructions of the Court to the jury.
It is not denied, that the note in controversy was not, at its maturity, presented for payment and protest, with notice-to the indorsers, regularly made at that time; but it is insisted, that the facts of this case, which have already been set forth with more than ordinary particularity, excuse demand and notice at maturity, and render the protest of the 17th of July, 1865, effectual to charge the indorsers.
The note in contest, as shown by the record, was the lawful property of the bank, at its maturity, where it was payable. The time and place of payment being fixed on the face of the note, it seems to be well settled, even independent of commercial usage, that if the holder be at the place during the time stipulated for the payment, and no one called to make payment, the contract is forfeited, and a right of action immediately accrues to the payee: The State Bank vs. Napier, 6 Hum., 270; Ogden et al. vs. Dobben & Evans, 2 Hall’s R., 112; Folger vs. Chase, 18 Pickering, 53.
In further illustration of this doctrine, Judge Story, in delivering the opinion of the Court, in the case of The ■ Bank of the United States vs. Corneal, 2 Peter’s R., 543, says: “On the day when the note became due, it was in *457 the Bank of Oincinnati, the bank being the holder thereof ; and it being payable there, after the usual banking hours were over, it was delivered to a Notary Public, by the officers of the bank, for protest, they informing him, at the same time, there were no funds there for the payment of the note. We are all of the opinion that this was sufficient proof of demand of payment. When a note is payable at a bank, it is the duty of the payor to be at the bank, within usual hours of business, to pay the same; and if he omits so to do, and a demand is then made by the holder within those hours, and it is refused, or neglected to be made, the holder is entitled to maintain his action for such dishonor. But, when the bank is itself the holder of the note so payable, no formal demand is necessary to be made of payment. The maker has the whole period of the usual banking hours to pay it; and if he does not pay it within those hours, it is equivalent to a demand and refusal of payment on his part, and the note ought not to be delivered out for protest, until after those hours are passed. If the bank has funds of the' maker in its hands, that might furnish a ground of defense to a suit brought for non-payment; but this is properly a matter of defense to be shown by the party sued, like any other payment, and not matter to be disproved by the bank by negative evidence.”
But the liability of the maker is not controverted in' this case. He does not appeal, and the real contest arises on the liability of the defendants, E. M. Apperson & Co., who are the indorsers, and who alone appeal.' Are they liable on their indorsement ? This is the ques *458 tion for our determination. On the one hand, it is insisted, that the war existing between the revolted States and the United States, at the maturity of the note, together with the forcible removal of the assets of the bank, including the note sued on in this case, coupled with the political disturbances resulting from the war, excuse the omission to present the note at its maturity; and that presentment, with notice of protest, to the in-dorsers, within a reasonable time after the removal of the obstacles, is due and legal presentment, and, after notice of protest, charges the indorsers. And, on the other hand, it is contended, that the causes relied on by the bank, and as disclosed in the record, are insufficient to excuse the regular presentment of the note at maturity.
As a general rule, to fix the liability of the drawer of a bill, or the indorser of a bill or note, there must be a legal presentment of the instrument to the acceptor or maker, or demand of payment from him, or at the place where it is payable, on the day on which the instrument is payable. But the non-presentment and demand at the time and place, when and where such note or bill is due and payable, may be excused by supervening causes. Judge Story,' in his work on Promissory Notes, section 257, thus sums up the grounds which excuse the want of due presentment for payment at the maturity of the note: “ The excuses may be general, and applicable to all persons who are in-dorsers ; or, they may be special, and applicable to a particular indorser only. Among the general excuses, the following may be stated as causes which will excuse *459 the want of presentment: 1st, 'Inevitable accident, or overwhelming calamity. 2d, The prevalence of a malignant disease, which suspends the ordinary operation of business. 3d, The presence of political circumstances, amounting to a virtual interruption and obstruction of the ordinary negotiations of trade, called the vis major. 4th, The breaking out of war between the country of the maker, and that of the holder. 5th, The occupation of the country where the parties live, or where the note is payable, by a public enemy, which suspends commercial intercourse. 6th, Public and positive interdictions and prohibitions of the State, which obstruct or suspend commerce and intercourse. 7th, The utter impracticability of finding the maker, or ascertaining his place of residence.”
The learned author continues: “Among the special excuses, may be enumerated the following: 1st, The receiving the note by the holder from the payee, or other antecedent party, too late to make due presentment. 2d, The note being an accommodation note of the maker for the benefit of a particular indorser. 3d, Special agreements between the holder and an antecedent indorser, waiving the presentment and demand. 4th, The receiving of security by an indorser, to indemnify himself against loss, or to enable him to take up the note at its maturity. 5th, The receiving of the note by the holder from an indorser, as collateral security for another debt. 6th, A promise by an indorser to pay the note, after a full knowledge that it had not been duly presented for payment by the holder.” See, also, 1 Parsons on Notes and Bills, 460, and note M.
*460 These causes, or any one of them, existing at the time of the maturity of the note, doubtlessly would, as a fact, ■ rather than a matter of law, both upon authority and reason, excuse the want of due presentment; and a presentment, with notice of protest, regularly made within reasonable time after the removal of such cause, would he legal and operative to charge the indorser: Story on Prom. Notes, sec. 258; Chitty on Bills, chap. 10, p. 485, and note F; also, Story on Bills, secs. 308, 327, 365.
None of the special excuses, as above indicated, exist in this case; and the controlling question is, whether or not the facts bring it within any one of the general causes laid down in the books, which excuse the want of presentment for payment, and protest for non-payment. We have seen that the bank being the holder of the note at its maturity, which was payable at its own counter, no formal or clamorous demand for payment was necessary, in order to dishonor the note. Now, did the existence of the late unhappy war, excuse the-notice of protest ? The municipal law of the State was not changed, superseded, or otherwise modified, by the mere military occupation of the city of Memphis, by the United States army. Admitting that a belligerent occupier or conqueror of enemy territory, under the laws of war, authorized the conqueror, or rather military occupier, for the time being, to supersede or change the municipal laws, the record does not show that any such thing was attempted; and, in the absence of all proof to the contrary, it is to be presumed the municipal laws remained in full force.
The law, both municipal and commercial, being the *461 same after the occupation as before; and the cashier of the bank, on his examination as a witness, having stated that there was not, at the maturity of the note, “any risk, danger, or difficulty in making demand of payment, or in giving notice,” it comes to this — whether the forcible removal of the assets of the bank, by the Confederate military authorities, excused the notice of dishonor ?
It is clear, under the authorities we have already referred to, that the law requires of the holder of commercial paper, no impossibilities; but it does impose upon him the exercise of reasonable diligence, not only in making demand of payment, but, after such demand and refusal, in giving notice of its dishonor. The loss, mislaying, ' or destruction of the paper, at the time of its maturity, furnishes no excuse; for the maker might still be willing to pay, upon indemnity being offered and given to him, or even without an indemnity, when he had a firm personal confidence in the integrity and high commercial solvency of the holder: Story on Prom. Notes, secs. 244, 245, also 203 and 241.
But the law requires a protest to be made, upon the dishonor of a promissory note by the maker, as well as a bill of exchange by the acceptor: and it has been said, that, inasmuch as a protest must include in it a copy of the note or bill, it is impossible to include one, when the note or bill is lost or destroyed. “But Pothier,” says Judge Story, “with great truth and acuteness, remarked, that this may be a very good reason why a copy or transcript should not be put in the protest, and the formality be dispensed with; but that it furnishes no ground why a demand of payment, and protest for non-payment, *462 should not be made, since neither of them is impossible in such a caseStory on Prom. Notes, sec. 245.
Without accumulating authorities to the same point, it is obvious that the bank, in this case, was not excused by the removal of its assets, which included the note in suit, from making demand of payment, and protest for non-payment. This could have been done on a copy; and the subsequent action of the bank demonstrates, that it was fully in the power of the bank, at the maturity of the note, to have incorporated in the protest, a substantial copy of the note, drawn from the “descriptive list” of the bills and notes, forcibly removed South. This the bank failed to do; and now insists, as the reason for it, the place of payment was not known. This is not sufficient to excuse them, especially in the absence of all proof of reasonable effort to ascertain the place of payment. The original being lost, destroyed, or, as in this case, placed, by force, beyond the control of the bank, it was bound, there being no legal excuse existing at the time, to make due presentment, and give notice upon a substituted copy, which must always be in as near conformity to the original as practicable: 2 Parsons on Bills and Notes, 260, 261; Edwards on Bills and Notes, 492, 493.
This duty the bank did not attempt to discharge, until the 13th of May, 1865 — more than two years after the maturity of the note — when the effort to substitute a copy was completely successful. Such omission of duty, under the strict rules of law which have always been applied to commercial paper, cannot be tolerated — to say nothing of the pregnant fact, that the bank had *463 timely notice that its assets would be removed, and that it had previously sent its coin, voluntarily, further South, and the probable complicity of the officers of the branch bank at Memphis, with the removal.
The political circumstances existing at Memphis, at the maturity of the note in question, as disclosed by this record, although unfavorable, in many respects, to the regular negotiations of trade, did not excuse the due presentment of the note, and protest thereon. To have this effect, the political disturbances existing in the town or city, where or when the note is payable, must be such as to render it impossible, or eminently dangerous, to make presentment for payment, and protest for nonpayment. No such circumstances, as it is clearly shown by the proof, existed in the city where the bank was located, and the plaintiff in error resided, at the time of the maturity of the note in controversy: Story on Prom. Notes, sec. 261.
The war, it is true, was, at that time, flagrant; but the city of Memphis was then included within the military lines of the Federal army, and the reason which excuses due presentment, on account of open war existing between the country of the maker and that of the holder, does not exist. Such reason can only be availing in a civil war, as in a foreign war, where the maker, or other party liable on the bill or note, is separated from the holder by the military lines of the two opposing parties. This, as in foreign wars, constitutes a clear and admitted exception; for war between two countries, or different parts of the same country, during its existence, suspends all commercial intercourse, trade and business, *464 between the inhabitants of the two countries, or people of the same country, in a civil war, respectively occu.pied by the opposing hostile parties; and,.indeed, such intercourse, by the laws of war, during the war, is absolutely prohibited, and, for the plainest reason, is everywhere recognized as excusing presentment and protest for non-payment; Story on Prom. Notes, sec. 262, and authorities cited.
Other questions have been presented in argument, which we do not think material to be discussed, as the principles of law already announced, are conclusive of this case.
Reverse the judgment.